FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA   03 MAY 13 PM 3: 40
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

PHILLIP M. STACY,                )
                                 )
         Plaintiff,              )
                                 )
v.                               )     Case No.  CV-01-TMP-715-S
                                 )
BUSINESS INTERIORS, INC.,        )
                                 )
         Defendant.              )           ENTERED
                                             MAY 1 3 2003

**MEMORANDUM OPINION**

This cause is before the court on the motion for summary judgment filed by the defendant, Business Interiors ("BI"), on November 4, 2002.  Defendant seeks dismissal of all of plaintiff's race and age discrimination claims because, defendant contends, there is no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law.  This matter has been briefed by the defendant and supported by an evidentiary submission.  Plaintiff, who is appearing *pro se* after a dispute with his attorneys resulted in their withdrawal, has failed to offer any response.  The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c); accordingly, the court enters this memorandum opinion.

34

## I.  FACTS

Plaintiff Phillip M. Stacy, who is black and over the age of 40, brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, alleging that he was wrongfully discriminated against by his employer, the defendant, on the bases of his race and age.  More specifically, he alleges that he was paid less than similarly situated white co-workers.  Stacy also asserts that he was told by BI managers Tommy Moody and Jamar James that he was "old as dirt", an "old man", an "old goat", and "old as black pepper".  Plaintiff also alleges that James and Moody told him he needed to "let the young bucks take over" and that he "couldn't keep up with the young bucks".  Finally, Stacy claims James and Moody told him he was "senile" and was losing his sight.  Lee Moody, another manager, referred to Stacy as an "old fart" and said he was "senile."  Co-workers also made disparaging remarks about plaintiff's age.  These remarks were overheard by Barry Yother, a BI manager who became Stacy's supervisor in September 1999.

Plaintiff's claims arise from his employment in BI's Birmingham warehouse.  BI is an office furniture business that sells and installs office furniture in Alabama.  Stacy was hired on September 2, 1997, as an entry level employee with the title of "installer".  He was paid $11.25 per hour.  On September 23, 1998,

2

Stacy was given a raise to $11.70 per hour.  Stacy's annual review reported that he "meets expectations," and that he had taken one sick day and had been tardy for work 17 times.  He was ranked a 6.4 on a 10-point scale.  The review was prepared by Steve Lord, warehouse manager at the time.

In September 1999, Lord was replaced by Barry Yother.  In December 1999, Yother gave Stacy his second annual review.  Stacy scored 73.5, which was just below the "good" range.  He was reported as tardy on 59 occasions during the second year.  Stacy was promoted from installer to supervisor, a position one level above the entry level installer position.  His pay was increased to $12.50 per hour, and the raise was made retroactive to September 1999.

In late 2000, BI determined that it needed to cut costs.  BI's vice president and chief operating and financial officer, Larry Carr, decided to order the termination of five employees from the Birmingham warehouse.  Carr instructed John McCarley, BI's general manager, to terminate the five "worst performers".  McCarley directed Yother to make the reduction in force and told Yother that he preferred that one employee be terminated from each of the five positions.[1]  Yother then met with four project managers (Terry Smyly, Tommy Moody, Charlie Crump, and Robert Young) who had more

---

[1]     The five positions apparently were described as installer, supervisor, helper, service, and shipping/receiving.

hands-on experience with the daily work assignments.  At their meeting, the project managers and Yother agreed that plaintiff was the worst performer of any supervisor.  The project managers said plaintiff did not get along well with other supervisors or co-workers, had threatened certain employees, and did not always follow directions.  Yother determined that plaintiff should be the supervisor who would be terminated.  He reported to McCarley that Stacy had been selected because of poor performance, poor attendance, and an inability to get along with co-workers. McCarley approved the termination of the five employees selected, which included plaintiff.  On July 28, 2000, Yother met with Stacy and told him that his employment was terminated.

After Stacy was terminated, he called Carr to question the termination.  He then met with Carr and McCarley about his termination.  Carr asked McCarley to investigate the reasons for Stacey's termination.  An investigation was conducted, documentation of problems with Stacey were produced, and Carr, McCarley, and Yother met to discuss the complaints.  Carr then upheld plaintiff's termination, having determined that plaintiff was the poorest performer of the supervisors.

On August 21, 2000, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, which issued a right-to-sue letter on February 7, 2001.  On March 21, 2001, plaintiff filed the instant complaint.  On November 4, 2002, the

4

defendant moved for summary judgment on all of plaintiff' claims, asserting that the plaintiff has failed to: (1) show that he was paid less than other employees with the same experience or expertise to support a claim of discriminatory pay; and (2) state a *prima facie* case of age discrimination.

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477

U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477

U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  DISCUSSION

#### A.  *Prima Facie* Case

Plaintiff's claims arise from the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, ("ADEA") and from Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*  The ADEA prohibits an employer from using the employee's age as a determining factor in any adverse employment actions.  <u>See</u> <u>Zaben v. Air Products & Chemicals, Inc.</u>, 129 F.3d 1453 (11th Cir. 1997).  Similarly, Title VII prohibits an employer, including the federal government, from discriminating against an employee on the basis of race.  <u>See, e.g.,</u>  <u>Holifield v. Reno</u>, 115 F.3d 1555 (11th Cir. 1997).

In order to survive a motion for summary judgment, the plaintiff in a reduction-in-force age discrimination case first must establish a *prima facie* case by showing that he (1) was a member of the protected age group, (2) was qualified for the position he held, or was qualified to assume another position at the time of discharge, and (3) there is evidence from which a reasonable factfinder could conclude that the employer intended to

discriminate on the basis of age in making the employment decision. See Mitchell v. USBI Company, 186 F.3d 1352 (11th Cir. 1999); Williams v. Vitro Services Corp., 144 F.3d 1438, 1441 (11th Cir. 1998).[2]  Comments regarding the plaintiff's age, when made by someone other than one who acts as a decision-maker with regard to the employment action, do not raise an inference of discrimination. Id. at 1355, citing Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318 at 1329-30 (11th Cir. 1998).

To establish a *prima facie* case of Title VII race discrimination in the realm of pay, plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he received low wages; (3) a similarly situated person outside the protected class received higher wages; and (4) he was qualified to receive the higher wages.  MacPherson v. University of Montevallo, 922 F.2d 766, 774 (11th Cir. 1991) In addition, a claim based on Title VII discrimination in the realm of pay, as opposed to a claim based upon the Equal Pay Act, requires proof of discriminatory intent. Mulhall v. Advance Security, Inc., 19 F.3d 586 (11th Cir. 1994).

In order to establish the *prima facie* case of age or race discrimination, a plaintiff may present to the court: (1) direct evidence that "discriminatory animus played a significant or

---

[2]     The Eleventh Circuit Court of Appeals has recognized that the standard for establishing a *prima facie* case differs in a reduction of force from the standard in an ordinary termination case.  Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1346-47 (11th Cir. 2000).

substantial role in the employment decision," Eskra v. Provident
Life and Accident Ins. Co., 125 F.3d 1406, 1411 (11th Cir. 1997),
or (2) circumstantial evidence of discrimination, in accordance
with the four-part test set forth in McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or
(3) statistical evidence of a pattern of discrimination.    Zaben,
129 F.3d at 1457.

Direct evidence is evidence that establishes the existence of
discriminatory intent behind the employment decision without
requiring the factfinder to make any inferences or presumptions.
Carter v. City of Miami, 870 F.2d 578, 580-81 (11th Cir. 1989).
When the plaintiff relies upon circumstantial evidence, rather than
direct evidence, he creates a presumption of discrimination by
establishing a prima facie case.  The presumption may be rebutted,
however, if the employer offers a legitimate, nondiscriminatory
reason for the employment action.    Once the nondiscriminatory
reason is articulated, the burden shifts to the plaintiff to show
that the reason is either not worthy of belief, or that, in light
of all the evidence, a discriminatory reason more likely motivated
the decision than the proferred reason.    Standard v. A.B.E.L.
Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) reh'g and reh'g
en banc denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v.
Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert.
denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

Essentially, the court must determine whether the plaintiff has presented competent admissible evidence that BI paid Stacy less than comparators because of his race and terminated Stacy because of his age. See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983). It is not the duty of this court to evaluate whether the decisions to pay Stacy less or to terminate Stacy's employment were fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes. See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Questionable business judgment is not evidence of discrimination. See id. Moreover, courts have recognized that the ADEA should not be used to override employment decisions "based on individual assessments of a person's abilities, capabilities, or potential." Magruder v. Selling Area Mktg. Inc., 439 F. Supp. 1155 (N.D. Ill. 1977)

### 1.  Age Discrimination

Plaintiff has shown that he is a member of the age group protected by the ADEA and that he was qualified for his position at the time of discharge. The issue, then, is whether there exists "evidence from which a reasonable factfinder could conclude that the employer intended to discriminate on the basis of age" in

11

making the decision to terminate Stacy during the reduction in force. If such evidence exists, Stacy will have met his burden of proving a *prima facie* case of age discrimination.

In support of his age claim, Stacy argues that he was terminated by BI on account of his age. Stacy's evidence of age discrimination is that he was called "old man" or "old fart", and otherwise referred to in terms of age, on a regular basis by co-workers and managers at BI. The only manager named by plaintiff who made an age-related comment, and who played any role whatsoever in the reduction in force was Tommy Moody. Stacy alleges that Tommy Moody, along with Jamar James, referred to him as an "old man", an "old goat", and "old as black pepper". However, there is no evidence that any BI employee who was a decision-maker[3] in the termination act ever made an age-related comment to or about Stacy. Stacy states only that Yother overheard others referring to him in

---

[3]     It is not clear what position at BI Tommy Moody held, but apparently he was a manager with some authority over Stacy, at least at the time Stacy was hired. Stacy apparently interviewed with Tommy Moody and Steve Lord at the time he was hired. Moody was one of the project managers who met with Yother in relation to the reduction in force decisions, but it is clear that Yother made the initial decision to terminate Stacy, and that Yother's decision was subject to approval and review by both McCarley and Carr. It is worthy of note that, assuming Moody did have a significant role in hiring and firing decisions, which plaintiff has not shown, Moody apparently was one of the managers who chose to hire Stacy in 1997, when Stacy already was in his 50s. This fact weighs against any presumption that Moody would have then chosen to terminate Stacy on account of his age about three years later.

the disparaging terms described *supra*.[4]  Moreover, Stacy does not
allege that the remarks were related to the process of deciding
who to terminate.  The Eleventh Circuit Court of Appeals has
consistently found that statements by non-decision-makers are not
probative of discriminatory intent.  For example, in <u>Mitchell</u>, the
court determined that a manager's suggestion that the layoffs were
aimed at employees who were "more secure" and did not have "young
children in school" was not evidence of intent when made by a
manager who was not a decision-maker in the layoff at issue.  186
F.3d at 1355.  <u>See also</u>, <u>Standard</u>, 161 F.3d at 1329-30 (holding
that comment that "older people have more go wrong" was not
probative of discriminatory intent); <u>Mauter v. Hardy Corp.</u>, 825
F.2d 1554, 1558 (11th Cir. 1987)(reference to "weed[ing] out the old
ones" not relevant to intent); <u>Barnes v. Southwest Forest Indus.</u>,
814 F.2d 607, 610-11 (11th Cir. 1987)(comment that worker could not
pass a physical examination "at [his] age" did not raise issue of
discriminatory intent).

   Furthermore, the unrefuted evidence demonstrates that Stacy
was deemed by BI management as a "poor performer," and the court

_____

   [4]   The fact that Yother overheard the remarks might have
some relevance to a case in which plaintiff alleges that ageist
comments created a hostile work environment, but the court finds
the fact that Yother heard others referring to Stacy's age in a
rude or insulting manner does not present evidence that Yother
was motivated by an age-related animus when helping to make the
decision to terminate Stacy.

will not second-guess BI's business judgment about Stacy's capabilities and performance.

In light of the fact that the plaintiff has failed to provide any evidence from which a reasonable factfinder could conclude that BI intended to discriminate on the basis of age when it made the decision to terminate Stacy, the court concludes that plaintiff has failed to make a *prima facie* showing that he was terminated because of his age.

### 2. Disparate Pay

Plaintiff asserts that white supervisors with substantially the same duties as plaintiff were paid more than he was, and that the pay differential existed because of plaintiff's race. Plaintiff asserts that the comparators on the wage issue are Thomas Marriott, Howard Fortenberry, Lee Moody,[5] Jeff Mills, Jeff Hudson, and Brandon Herring.  The evidence shows the following:

Thomas Marriott was hired in February 2000 at $12 per hour. At that time, Stacy was earning $12.50 per hour; therefore, Marriott was not being paid more than Stacy at that time. Furthermore, Marriott had 10 years of experience as a supervisor

---

[5]     BI apparently employed two workers with the last name of Moody.  The Moody referred to in reference to the age remarks apparently was Tommy Moody, and the Moody referred to in reference to plaintiff's race claim is Lee Moody.  Accordingly, the court refers to Lee Moody by his first and last name on all occasions.  Any reference merely to "Moody" is a reference to Tommy Moody.

for prior employers; Stacy did not.  In May 2000, Marriott was promoted to supervisor, and his pay was increased to $13.50 per hour.  His ranking on the evaluation showed that he received a score of 87.5.

Howard Fortenberry was paid more than Stacy, but his reviews in 2000 and 2001 rated him at 88 and 86.5, significantly higher than Stacy, and mid-way on the company's scale between "good" and "outstanding".   Furthermore, Fortenberry had eight years of experience as a supervisor for prior employers.  Accordingly, both Marriott and Fortenberry had many years of experience as supervisors that plaintiff did not have, and both ranked significantly higher than plaintiff in the evaluation rankings.

Lee Moody was promoted to supervisor in July 1998, when his pay was increased from $10.50 per hour to $11.25.  At that time, Lee Moody was earning as a supervisor the same hourly wage Stacy was earning as an installer.  Lee Moody's pay was increased to $13.25 in March 1999 following his annual review.[6]  Lee Moody was given a merit increase to $14.75 more than a year later in May 2000.  Lee Moody's evaluation dated May 2000 shows that he was rated at 88, midway between "good" at 75 and "outstanding" at 100.

---

[6]    It appears from the documents produced by defendant that Moody's pay was increased to $12.50 at some time before March 1999, but there is no document that reflects that increase.

15

Jeff Mills was promoted from installer to supervisor on January 25, 1999, when his pay was increased from $10 per hour to $11.25. Thus, his pay was less in early 1999 than Stacy's. He received a raise to $12 in May of 1999, retroactive to February 16, 1999, which was less than Stacy received when he was promoted later in 1999. Mills was rated at 88, far above Stacy's 73.5. In February 2000, Mills was again reviewed, and was given a merit increase to $14 per hour, surpassing Stacy's $12.50. Accordingly, both Moody and Mills were ranked far superior to Stacy in BI's evaluations. For the reasons set forth herein, the court concludes that Marriott and Fortenberry cannot be viewed as comparators because of the differences in the rankings of their job performances. Likewise, Moody and Mills cannot be deemed comparators because they were rated as "good" to "outstanding" employees, while Stacy was ranked below the "good" level.

Plaintiff's final two alleged comparators, however, may not be dismissed so easily. Jeff Hudson was hired by BI in 1996, more than a year before Stacy. He was paid $11.75 prior to July 1999, $.05 more than Stacy was paid at the same time. After the July 1999 review, Hudson was promoted to supervisor and his pay increased to $13.25. His evaluation dated July 1999 ranked Hudson at 6.57[7] and showed that he had 4 days of sick leave and 7 tardies.

---

[7]    Although defendant does not explain the differences in evaluations, Hudson was ranked on a 1-10 scale, while the other evaluations were on a 1-100 scale. In any event, it appears that

16

His evaluation for the periods July 1999 through July 2000 showed that he was ranked at 74 out of 100, just half a point higher than Stacy's rating.

Brandon Herring was paid $12.50 per hour prior to December 1999, when his pay was increased to $13.50 at the end of his probationary period. An evaluation dated December 21, 1999, rated Herring at 74.5, slightly higher than Stacy. The evaluation shows Herring had 2 absences and 17 tardies. An evaluation dated June 2001 shows that Herring's rating increased to 87, and that he had taken 3 unpaid absences, 3 sick days, and 8 tardies.

Stacy has not offered any evidence that any race discrimination existed, except to point to the six employees described herein and to argue that they were paid more than Stacy. However, because of the differences in experience and rankings, the court simply cannot conclude that Marriott, Fortenberry, Moody, or Mills was similarly situated to Stacy. Hudson and Herring, however, present a different scenario. Hudson had only a year more experience than Stacy, and his ranking was virtually identical. Defendant has not presented evidence that persuades the court that Hudson had any skills or abilities that surpassed those of Stacy. Herring had less experience than Stacy, having been hired a year after Stacy, and ranked only 1 point higher than Stacy in 1999.

the rating of 6.57 is, for all practical purposes, equivalent to a 65.7 rating under the 100-point system.

17

Although defendant argues that Herring's ranking increased to an impressive 87 in 2001, this ranking comes a year after Stacy was terminated, and thus is irrelevant to any comparison of Herring to Stacy at the time of the reduction in force in 2000.  Furthermore, Herring was given a raise from $12.50 to $13.50 after only four months on the job, performing as a supervisor, like Stacy.  At the same time, Stacy was paid only $12.50.  The only notable differences to be gleaned from the evidence presented by the defendant are that Herring and Hudson were not tardy as often as Stacy.  That fact, however, without more, does not establish a plausible explanation for the pay differential.[8]  There is no evidence that Stacy was disciplined for his tardiness or that attendance was an issue taken into consideration by BI in establishing its pay rates.  Accordingly, the court must conclude that Hudson and Herring were similarly situated for purposes of a *prima facie* case of disparate pay on the basis of race.  Stacy, therefore, has met his burden of proving a *prima facie* case of race discrimination in disparate pay as to those two comparators.  The issue of whether the company's decision to pay Hudson and Herring more than Stacy was motivated by race presents a genuine issue of material fact that must be resolved by a jury.

---

[8]      It could be argued that Herring was tardy as frequently as Stacy in that his evaluation showed that he was tardy 17 times in a three-month period.  Stacy's 59 tardies were accumulated over a year.

18

Consequently, defendant's motion for summary judgment on the pay issue is due to be granted in part, as to the pay differential between Stacy and Marriott, Fortenberry, Mills, and Moody. The motion is due to be denied as to the comparison in pay between Stacy and Hudson and Herring.

### B.  Non-discriminatory Reason

Even if the plaintiff had met his initial burdens in proving a *prima facie* case on all his claims of age or race discrimination, the defendant still may be entitled to summary judgment in its favor. Because the defendant has offered a legitimate, nondiscriminatory reason for the pay differences and the termination, Stacy must, in order to overcome the defendant's motion for summary judgment, demonstrate by competent, admissible evidence that the nondiscriminatory reason is merely a pretext and that BI's true reason is age- or race-based discrimination. The reason given by the employer "cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993). Furthermore, the court should determine whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's articulated reason that it is

"unworthy of credence." Combs, 106 F.3d at 1538 (citations omitted).

Even assuming plaintiff has met his *prima facie* burden, the court finds that the defendant is entitled to summary judgment in its favor on all claims except the pay claims related to Hudson and Herring. BI has set forth legitimate, non-discriminatory reasons for paying four of the other supervisors more than they paid Stacy and for terminating Stacy during the reduction in force. All of the evidence indicates that Stacy had lower ratings and less experience than four of the six supervisors he names. The evidence further shows that BI considered ratings and experience in making its pay decisions. Accordingly, Stacy has failed to show that the company's non-discriminatory reason for paying four of the comparators more than Stacy - that the pay was based upon experience and ability - is not worthy of belief.

As to the termination, Yother, Carr, and McCarley, the decision-makers, testified that they initially singled out Stacy because of his repeated tardiness and his low ratings, and that, even after re-evaluating Stacy's capabilities, they still determined that he was the "worst performer" and therefore the best candidate for termination. Stacy argues that he was a better performer than others, but even if Yother, Carr, and McCarley were wrong, or misguided, or even incompetent, such conduct does not give rise to a discrimination claim. There is simply no evidence

20

whatsoever that BI's nondiscriminatory reason for the termination - that the decision-makers felt that Stacy was a lower-level performer - is a pretext for discrimination.

The court finds little or no support for plaintiff's argument that the proferred explanations are a pretext.  The defendant's articulated nondiscriminatory reason has not been shown to be unworthy of belief, and age or race animus has not been shown to be the more likely reason that Stacy was paid less than four of the comparators or that Stacy was terminated as part of the reduction in force.  Not only has Stacy failed to meet his primary burden of making a *prima facie* case on all but the pay claims relating to Herring and Hudson; he also has failed to meet his secondary burden of showing that BI's stated reasons for the pay or termination were pretextual.   Consequently, Stacy's claims of age and race discrimination, except the pay claims relating to Hudson and Herring, are subject to summary judgment in favor of the defendant under the <u>McDonnell Douglas</u> test as adopted by the Eleventh Circuit.  <u>Williams v. Vitro Services Corp</u>., 144 F.3d 1438, 1441 (11th Cir. 1998).


### IV.  CONCLUSION

Based on the foregoing undisputed facts and legal conclusions, the court determines the motion for summary judgment filed by the defendant is due to be granted in part and denied in part and all

21

of plaintiff's age claims and the pay claims relating to Marriott, Fortenberry, Mills, and Lee Moody are due to be dismissed with prejudice.  The motion for summary judgment regarding plaintiff's claims of disparate pay relating to the pay given Hudson and Herring are due to be denied.

A separate order will be entered in accordance with the findings set forth herein.

DATED this 13th day of May , 2003.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

22